**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| DONNA and DENNIS EMLEY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-2350-SEB-TAB |
| | ) |
| WAL-MART STORES, INC., | ) |
| L.N.K. INTERNATIONAL, INC., and | ) |
| L. PERRIGO COMPANY, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS L. PERRIGO COMPANY AND WAL-MART STORES, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR**
**CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

**I.    INTRODUCTION**

Defendants L. Perrigo Company ("Perrigo") and Wal-Mart Stores, Inc. ("Wal-Mart") by and through their undersigned attorneys, respectfully move this Court to amend its Entry on Motions for Summary Judgment (Dkt. 199) (hereinafter the "Summary Judgment Order") to include language, in accordance with 28 U.S.C. § 1292(b), certifying the preemption ruling in the Summary Judgment Order for an immediate interlocutory appeal. The sole controlling legal question that should be addressed on interlocutory appeal is whether Plaintiffs' failure-to-warn claims against Perrigo and Wal-Mart are preempted by federal law.

As detailed in the memorandum below, the question of preemption meets the standards in this Circuit for interlocutory appeal: this issue constitutes a threshold *question of law* involving the interpretation and application of federal regulations and the Supremacy Clause; it is *controlling*, as reversal on appeal would lead to the dismissal of Perrigo and Wal-Mart from this case; it is *contestable*, as the specific preemption question at issue is a difficult issue of first impression; its

resolution will *expedite the resolution of the litigation*; and this petition is being filed *within a reasonable period of time* from this Court's Summary Judgment Order.

Perrigo and Wal-Mart submit that seeking appellate review now on the purely legal issue of preemption will ultimately serve the best interests of the parties and this Court. If the Seventh Circuit finds that preemption applies, all remaining claims against Perrigo and Wal-Mart will be precluded. In that event, both the Court and the parties would be spared the cost and time of engaging in a jury trial to resolve Plaintiffs' failure-to-warn claims. If, in contrast, the Seventh Circuit grants a petition for appeal and finds that preemption does not apply, the Court and the parties would then have clarity on a critical legal issue to this case, lifting a potential cloud that would otherwise hang over trial and any pre-trial settlement discussions.

## II.   BACKGROUND

### 1.   The factual allegations underlying the preemption question are undisputed.

The factual allegations underlying the question of law that Perrigo and Wal-Mart seek to present to the Seventh Circuit are undisputed. Plaintiffs allege that they purchased Equate Acetaminophen, an over-the-counter ("OTC") drug product manufactured by Perrigo, at a Wal-Mart store in Fort Wayne, Indiana "in or around late November 2013." Pls.' Am. Compl. ¶ 12. Plaintiff Donna Emley allegedly later ingested that medication on June 11 and 12, 2015, *see id.*, and on June 13, 2015 "began to develop a rash and other skin-related symptoms." *Id.* at ¶ 17. Plaintiffs subsequently purchased another OTC product containing acetaminophen, Equate "Severe Allergy & Sinus Headache," from a different Wal-Mart store in Tennessee, and Mrs. Emley also ingested that product. *Id.* at ¶¶ 4-5, 18. The Equate "Severe Allergy & Sinus Headache" product was manufactured by defendant L.N.K. International, Inc. ("L.N.K."). *Id.* Thereafter, Mrs.

2

Emley's skin-related symptoms worsened, and she was hospitalized and ultimately diagnosed with Steven's Johnson Syndrome ("SJS") and Toxic Epidermal Necrolysis ("TEN"). *Id.* at ¶ 11, 21.

Plaintiffs contend that the ingestion of the Perrigo-manufactured Equate Acetaminophen product and/or L.N.K.-manufactured "Severe Allergy & Sinus Headache" product was the proximate cause of Mrs. Emley developing SJS/TEN. *Id.* at ¶ 21. And, Plaintiffs contend that Defendants are liable under Indiana state product liability law for not including an "Allergy Alert" warning stating that acetaminophen can cause severe skin reactions on the label of the Equate acetaminophen-containing products. *See* generally, Pls.' Am. Compl.; *see also* Dkt. 199, p. 4 (Court's Entry on Motions for Summary Judgment, summarizing Plaintiff's allegations).

### 2.     The relevant regulatory background for preemption is likewise undisputed.

There is likewise no dispute as to the relevant regulatory background underlying the preemption question. The Perrigo-manufactured Equate Acetaminophen sold by Wal-Mart is an OTC Monograph product, governed by an entirely separate and distinct set of federal regulations from other types of OTC drug products. *See* Dkt. 86 pp. 3-10 (explaining the regulatory framework for OTC Monograph drug products); *see also* Dkt. 199, pp. 7-8 (same). All parties have agreed that Equate Acetaminophen is regulated under an Internal Analgesic Tentative Final Monograph[1] ("IAAA TFM"). *See* Dkt. 86 pp. 11 (Perrigo's Statement of Material Facts Not in Dispute in support of its Motion for Summary Judgment on the Basis of Preemption); Dkt. 102, p. 3 (Plaintiffs' Opposition to Perrigo's summary judgment motion). The FDA published the IAAA TFM in 1988, over 30 years ago, and it has still not issued a final monograph for internal analgesic OTC products, including acetaminophen. Dkt. 86, p. 6.

---

[1] "Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use; Tentative Final Monograph," 53 Fed. Reg. 46204 (Nov. 16, 1988).

As the Court noted in its Summary Judgment Order, the IAAA TFM does not contain an Allergy Alert warning "relating to severe skin reactions such as the one suffered by [Plaintiff] Donna [Emley]." Dkt. 199, p. 8. On August 1, 2013, approximately two months prior to Mrs. Emley's alleged purchase of the Perrigo-manufactured Equate Acetaminophen product, the FDA issued a Drug Safety Communication with the purpose of "informing the public that acetaminophen has been associated with a risk of rare but serious skin reactions." *Id.* (quoting FDA Drug Safety Communication: FDA warns of rare but serious skin reactions with the pain reliever/fever reducer acetaminophen, found at https://www.fda.gov/drugs/drugsafety-and-availability/fda-drug-safety-communication-fda-warns-rare-serious-skin-reactionspain-relieverfever-reducer (last visited July 21, 2019)). In that Drug Safety Communication, the FDA stated its intent to:

> require that a warning be added to the labels of prescription drug products containing acetaminophen to address the risk of serious skin reactions. FDA will also request that manufacturers add a warning about serious skin reactions to the product labels of OTC acetaminophen drug products marketed under a new drug application and will encourage manufacturers of drug products marketed under the OTC monograph do the same.

*Id.* at 8-9.

However, the Drug Safety Communication did not provide any specific warning language for any type of acetaminophen product -- prescription products, OTC new drug application ("NDA") products, or OTC Monograph products. Several weeks after the Drug Safety Communication's publication, Perrigo learned of warning language the FDA intended to require on labels of an OTC *NDA* acetaminophen-containing product. Dkt. 86, p. 13. However, Perrigo did not learn the exact language and placement for a warning that could permissibly appear on its OTC *Monograph* product's label until more than a year later when, on November 28, 2014, the FDA issued a "Draft Guidance for Industry: Recommended Warning for Over-the-Counter

4

Acetaminophen-Containing Drug Products and Labeling Statements Regarding Serious Skin

Reactions," (found at Dkt. No. 86-9). The Guidance states, in pertinent part, that the FDA "does

not intend to object to the marketing of products containing the following warning language":

> Allergy alert: Acetaminophen may cause severe skin reactions. Symptoms may include: [bullet] skin reddening [bullet] blisters [bullet] rash If a skin reaction occurs, stop use and seek medical help right away.

*Id.* at 3.  The Guidance was subsequently finalized in January of 2017. *See* Dkt. 199, p. 9; Final

Guidance available at https://www.fda.gov/media/90572/download) (last visited July 23, 2019).

    As noted in the Summary Judgment Order, the Draft Guidance contained a standard agency

disclaimer (found in all FDA guidance documents, including the January 2017 Final Guidance)

that the document represented the current thinking of the FDA but was not binding on FDA or the

public. Dkt. 199, p. 9. However, the Draft Guidance was also published by the FDA in the Federal

Register, at 79 Fed. Reg. 70879-01. *See* Dkt. 86, p. 27-28 n.24. In that Federal Register notice for

the Draft Guidance, the FDA expressly stated that:

> The draft guidance is intended to inform manufacturers, members of the medical and scientific community, and other interested persons that at this time we do not intend to object to the marketing of single- and combination-ingredient, acetaminophen-containing, nonprescription (commonly referred to as over-the-counter (OTC)) drug products bearing a warning as described in the draft guidance alerting consumers that the use of acetaminophen may cause severe skin reactions.

79 Fed. Reg. 70879-01.

    **3.**    **Perrigo and Wal-Mart's summary judgment motions set forth a purely legal preemption argument well suited to interlocutory review.**

    In their respective motions for summary judgment on the basis of preemption,[2] Perrigo and

Wal-Mart argued that the Supreme Court has established a bright-line rule: when it is impossible

---

[2] *See* Dkt. 85, 86 (Perrigo's Motion for Summary Judgment on the Basis of Preemption and supporting Memorandum of Law); Dkt. 88, 89 (Wal-Mart's Motion for Summary Judgment on the Basis of Preemption and supporting Memorandum of Law).

for a drug manufacturer defendant to simultaneously satisfy the duty that a plaintiff seeks to impose through state tort law while also complying with federal law, the state law claim is preempted. In applying this "impossibility" preemption standard, the Supreme Court has recognized that federal law provides several avenues to market drugs, each of which has its own distinct regulatory framework. Consequently, the Supreme Court has held that whether "impossibility" preemption applies to preclude state law failure to warn claims depends on how the drug at issue is marketed, and whether federal law for that category of drug permits unilateral label changes.

In *Wyeth v. Levine*, 555 U.S. 555 (2009), the Court held that for drugs marketed under a New Drug Application (NDA), state law claims are ordinarily not preempted by federal law. The cornerstone of the Court's holding was the so-called Changes Being Effected ("CBE") regulation, 21 C.F.R. § 314.70, which permits, in some instances, a manufacturer of a drug ***being sold under an NDA*** to unilaterally add new warnings. But, in *PLIVA v. Mensing*, the Supreme Court unambiguously held that state tort law failure to warn claims against manufacturers of generic drugs marketed under an Abbreviated New Drug Application (ANDA) are preempted because generic manufacturers ***cannot*** use the CBE process or otherwise unilaterally change their product labeling. 564 U.S. 604, 614-18 (2011). Instead, generic manufacturers have a "duty of sameness" to keep their drug labels "the same at all times as the corresponding brand-name drug labels." *Id.* at 616-18. Because generic manufacturers cannot "independently satisfy" both that federal duty and any purported state law tort duty to add new warnings to their generic drug labels, state law failure to warn claims against generic drug products are preempted. *See id.* at 619-24. To date, the Supreme Court and federal Circuit Courts have yet to apply the principles of *Wyeth* and *Mensing* to a failure to warn claim against a manufacturer of an OTC Monograph drug product, whether regulated under a final drug monograph or (as here) a tentative final monograph.

Applying this binding Supreme Court precedent to the regulations governing OTC Monograph products, Perrigo and Wal-Mart argued that, pursuant to 21 C.F.R § 330.1 (a controlling regulation for OTC Monograph products that the parties have referred to in briefing as the "Exact Match" regulation), all warnings appearing on the labels of OTC Monograph products must contain only the "exact language" of warnings established in quotation marks in either the "applicable OTC drug monograph" or other federal regulations. Dkt. 86, p. 6-8; *see also* 21 C.F.R. § 330.1(c)(2).[3] Here, the IAAA TFM establishes certain warning language in quotation marks for acetaminophen OTC Monograph products. Perrigo and Wal-Mart argued that the IAAA TFM is an "applicable monograph," *see* Dkt. 86 at p. 7, and therefore, the "Exact Match" requirements of 21 C.F.R. § 330.1(c)(2) applied, barring Perrigo and/or Wal-Mart from adding any additional or different warnings to the label of the Equate Acetaminophen product other than those appearing in quotations in the IAAA TFM and in other applicable regulations.

Accordingly, Perrigo and Wal-Mart contended that under federal law, they could not permissibly add any new warning language to their OTC Monograph Equate Acetaminophen product's label until the FDA issued its November 2014 Draft Guidance, with its express statement of FDA enforcement discretion that the agency "do[es] not intend to object to the marketing of [OTC Monograph] drug products bearing a warning as described in the draft guidance." *See* Dkt. 86-9; 79 Fed. Reg. 70879-01. But, as noted, that Draft Guidance was not published until a year *after* the Emleys allegedly purchased the Perrigo-manufactured Equate Acetaminophen product, in November 2013. Thus, at the alleged time of purchase, it was impossible for Perrigo and Wal-

---

[3] More precisely, 21 C.F.R. § 330.1(c)(2) provides that OTC Monograph drug manufacturers have some leeway to describe the "Indications" for use of a drug using either indications in a monograph, or "alternative truthful and nonmisleading statements." *See id.* However, all other labeling for an OTC monograph product -- including drug safety information -- "shall be stated in the exact language where exact language has been established and identified by quotation marks in an applicable OTC drug monograph or by regulation . . . ." *Id.*

Mart to comply with Plaintiffs' purported state law duty to add new warnings to the Equate Acetaminophen product's label while also complying with federal law. Therefore, Perrigo and Wal-Mart maintained that Plaintiffs' claims must be preempted under the principles of impossibility preemption.

### 4. This Court denied Perrigo and Wal-Mart's summary judgment arguments on a purely legal basis.

On June 27, 2019, this Honorable Court issued a ruling on Perrigo and Wal-Mart's preemption summary judgment motions, along with other pending summary judgment motions filed by Perrigo, Wal-Mart, and L.N.K. International, Inc. *See* Dkt. 199. The Court explained that the preemption question before it was a pure question of law:

> Given the holdings in *Wyeth* and *PLIVA*, the question of whether the Plaintiffs' claims in this case are preempted hinges on whether the Defendants had the ability to unilaterally add the Warning at issue to the labels of their products prior to the issuance of the Guidance without violating federal law.

*Id.* at 10. The Court concluded that Defendants did have the ability to unilaterally add new warning language, and therefore denied summary judgment on the basis of preemption. *Id.* at 10-16.

The Court's ruling was rooted in its interpretation of the controlling OTC Monograph regulations. Under that interpretation, the Court concluded that a tentative final monograph, as a proposed rule, "does not have force of law." *Id.* at 11. And, the Court rejected Perrigo and Wal-Mart's argument that manufacturers are required to comply with the labeling and other provisions of a tentative final monograph under 21 C.F.R. § 330.1; the Court held that the IAAA TFM is not an "applicable monograph" under the terms of 21 C.F.R. § 330.1, holding that the phrase "applicable monograph" in the regulation "refers to a final monograph, not a tentative final monograph." *Id.* at 12. Thus, the Court concluded that "for acetaminophen there is no 'applicable

monograph[,]'" *see id.* at 12, and that the warnings and other labeling requirements stated in the IAAA TFM were merely "non-binding warning recommendations made by the FDA." *Id.* at 27.

Acetaminophen is one of the most commonly used over-the-counter medications for pain relief and fever reduction on the market in the United States. A 2002 article in the prestigious Journal of the American Medical Association ("JAMA") concluded that twenty-three percent (23%) of American adults report using acetaminophen in a given week. *See* Exhibit 1, David W. Kaufman, ScD et al., Recent Patterns of Medication Use in the Ambulatory Adult Population of the United States, 287 JAMA 337-344 (2002), and the FDA's website notes that is an active ingredient in hundreds of OTC and prescription medicines. FDA, "Acetaminophen Information," available at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm165107.htm (last accessed July 23, 2019). As discussed in greater detail below, the clear implication of the court's interpretation of the federal OTC Monograph regulations is that, for the more than 30 years since the publication of the IAAA TFM in 1988, the FDA has elected to allow the marketing of this commonly used drug taken by tens of millions of Americans each week to be essentially unregulated, with manufacturers free to deviate from the formulation, dosage, indications from use, and warning statements that the FDA believed were necessary for its safe and effective use.

For the reasons given below, Perrigo and Wal-Mart respectfully contend that the Court's ruling is an incorrect interpretation of the controlling regulations that is belied by the text of the regulations themselves and the purpose of the OTC Monograph regulatory scheme, as well as the FDA's consistent position that it can (and does) enforce the requirements of tentative final monographs. Moreover, given that the Court's ruling was a purely legal one that has broad implications for the sale of this extremely commonplace OTC drug product to tens of millions of consumers on a weekly basis, it is especially well-suited for resolution on interlocutory appeal.

## III.    ARGUMENT

### A.    The Court's order denying summary judgment on the basis of preemption meets the criteria for an immediate interlocutory appeal.

#### 1.    *Legal Standard*

A district court should certify an order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) when "(1) the appeal presents a question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation, and (5) the petition to appeal is filed in the district court within a reasonable amount of time after entry of the order sought to be appealed." *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief and Development*, 291 F.3d 1000, 1007 (7th Cir. 2002).  The Seventh Circuit has "emphasize[d] the duty of the district court . . . to allow an immediate appeal to be taken when the statutory criteria are met." *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000).

In this case, Perrigo and Wal-Mart ask the Court to certify the Summary Judgment Order so that the Seventh Circuit may consider the question of whether Plaintiffs' failure-to-warn claims are preempted. As discussed below, this issue constitutes a threshold and controlling question of law; the Court's resolution of the issue is contestable (because no federal Circuit Court has yet ruled on this issue and there are substantial grounds to dispute the Court's interpretation of the relevant regulations); resolving this question now will expedite the resolution of this litigation by clarifying a central legal question for this case; and this motion has been filed within a "reasonable amount of time" after the Summary Judgment Order entered on June 27, 2019.

Accordingly, because the failure-to-warn preemption issue meets each of the elements for interlocutory appeal under 28 U.S.C. § 1292(b), Perrigo and Wal-Mart move this Court to exercise its "duty" to certify it for an interlocutory appeal. *Ahrenholz*, 219 F.3d at 677.

###### 2.     *The preemption issue presents a question of law.*

An issue is a "question of law" if it involves "a question regarding the meaning of a statutory or constitutional provision, regulation or common law doctrine." *Boim*, 291 F.3d at 1007; *Ahrenholz*, 219 F.3d at 676 (same). Here, the preemption issue involves regulatory interpretation of federal regulations, as well as an assessment of the interaction between federal and state law, which implicates the Constitution's Supremacy Clause. *See*, *e.g.*, Dkt. 199, p. 10 n.3 (noting that the question of impossibility preemption "is whether the private party could independently do under federal law what state law requires of it.") (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011)); *see also Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010) ("[F]ederal preemption . . . occurs when a state law is invalidated because it conflicts with a federal law. The constitutional basis for federal preemption is found in the Supremacy Clause[.]").

In its Summary Judgment Order, the Court correctly held that whether federal law prohibited Perrigo and Wal-Mart from changing the label of the Equate Acetaminophen product to add warnings was "a question of law to be determined by the Court." Dkt. 199, p. 10 n.3. Other courts in this Circuit that have likewise held that "the issue of preemption involves a pure question of law." *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (quotations omitted); *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 504 (7th Cir. 2011) ("A district court's preemption ruling is a question of law that we review de novo.") (quotation omitted); *Askin v. Quaker Oats Co.*, No. 11 CV 111, 2011 WL 5008524, at *6 (N.D. Ill. Oct. 20, 2011) (identifying "whether state consumer protection statutes are preempted by the Food, Drug, and Cosmetic Act and how the FDA's labeling regulations should be enforced" as "questions of law") (internal citation omitted).

Courts in this Circuit and others have also held that a preemption ruling by a district court presents a question of law suitable for interlocutory certification under Section 1292. *See United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 608 (7th Cir. 2000) (agreeing to hear appeal certified by district court as to whether state tort claims against airliners were preempted by federal law); *Spong v. Fid. Nat. Prop. & Cas. Ins. Co.*, 787 F.3d 296, 304 (5th Cir. 2015) (holding that question certified by district court of whether plaintiff's state law claims against insurers were preempted by National Flood Insurance Act "certainly falls within the ambit of 28 U.S.C. § 1292(b)."); *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008) (finding issue of whether FDA preempted state law failure-to-warn claim "undoubtedly a controlling question of law"); *McNellis v. Pfizer, Inc.*, 2006 WL 2819046, at *11, *13 n.9 (D.N.J. Sept. 29, 2006) (certifying as a "question of law" the issue of "[w]hether . . . [the FDA's] requirements for the form and content of the labeling . . . preempted New Jersey's failure-to-warn law, under the doctrine of conflict preemption"), *rev'd sub nom. Colacicco v. Apotex Inc.*, 521 F.3d 253 (3d Cir. 2008), *cert. granted and judgment vacated*, 556 U.S. 1101 (2009).

The decision in *Knipe* is particularly instructive. In that case, plaintiff "argue[d] that the issue of preemption is fact-intensive and, thus, not a pure question of law amenable to interlocutory review." 583 F. Supp. 2d at 599. The court rejected this argument because it "disregards the very nature of the conflict preemption analysis, which turns precisely on whether two laws or regulations--one state, one federal--conflict, such that the latter preempts the former." *Id.* For this reason, the court held, "preemption, by its very nature, lends itself to interlocutory appeals." *Id.* And, the court noted that "[t]he mere fact that the preemption issue may require a detailed review of the regulatory records does not deprive it of its dispositive nature." *Id.* The same is true here.

Thus, the preemption issue here easily satisfies the first requirement of Section 1292(b).

### 3.     *The preemption question of law is controlling.*

A question of law is "controlling" if "its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996); *see also Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1092 (E.D. Cal. 2008) (the controlling question of law "does not need to dispose of the litigation, only advance its ultimate termination"). Moreover, "[a]t minimum a question is controlling when it would constitute reversible error on appeal if wrongly decided." *Merk v. Jewel Food Stores Div., Jewel Companies, Inc.*, No. 85 C 7876, 1986 WL 8969, at *2 (N.D. Ill. Aug. 14, 1986); *Segni v. Commercial Office of Spain*, 650 F. Supp. 1045, 1046 (N.D. Ill. 1987); *E.C. v. Buntrock*, No. 02 C 2180, 2003 WL 260711, at *2 (N.D. Ill. Feb. 3, 2003) (holding similarly); *see also* Criteria for Permissive Appeal, 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed.) ("There is no doubt that a question is 'controlling' if its incorrect disposition would require reversal of a final judgment, either for further proceedings or for a dismissal that might have been ordered without the ensuing district-court proceedings.").

Here, the presented preemption question undoubtedly meets the definition of a "controlling" question of law because if the Seventh Circuit were to disagree with this Court's ruling on the issue -- either following interlocutory appeal *or* after a full trial was held in this matter -- then Perrigo and Wal-Mart would be entitled to summary judgment on Plaintiffs' state tort law failure-to-warn claims. Moreover, numerous courts have found that questions of express and implied preemption are "controlling" under Section 1292(b). *See, e.g.*, *Ahrenholz*, 219 F.3d at 677 ("whether federal law preempts state business-tort law . . . was indeed a controlling issue" because it could "head off protracted, costly litigation") (emphasis in original); *City of Joliet v. Mid-City Nat. Bank*, No. 05 C 6746, 2008 WL 4889038, at *2 (N.D. Ill. June 13, 2008) ("the question

presented for interlocutory appeal is controlling" because "if the Seventh Circuit were to determine that [the] condemnation action was preempted . . . the district court would likely be required to dismiss"), *aff'd sub nom. City of Joliet, Ill. v. New W., L.P.*, 562 F.3d 830 (7th Cir. 2009); *In re Ocwen Fed. Bank FSB Mortg. Servicing Litig.*, No. 04 C 2714, 2006 WL 1371458, at *2 (N.D. Ill. May 16, 2006) (finding preemption issue controlling and certifying it for interlocutory appeal because reversal could lead to dismissal of certain claims), *aff'd*, 491 F.3d 638 (7th Cir. 2007); *Resolution Trust Corp. v. Gallagher*, No. 92 C 1091, 1992 WL 315218, at *4 (N.D. Ill. Oct. 23, 1992) (finding that whether federal law preempted common law causes of action was controlling because appealing preemption issue after trial created risk that "the whole trial will need to be repeated"), *aff'd*, 10 F.3d 416 (7th Cir. 1993); *Knipe*, 583 F. Supp. 2d at 599 ("The preemption issue here is undoubtedly a controlling question of law."); *Drake v. Lab. Corp. of Am. Holdings*, 290 F. Supp. 2d 352, 376 (E.D.N.Y 2003) (holding that "preemption issue 'involves a controlling question of law' ") (quoting 28 U.S.C. § 1292(b)), *aff'd and remanded*, 458 F.3d 48 (2d Cir. 2006).

Accordingly, the preemption issue here readily meets the second requirement of Section 1292(b).

### 4.      *The preemption question of law is contestable*

The failure-to-warn preemption question to be addressed on interlocutory appeal also is contestable--i.e., it involves an issue as to which there is substantial ground for difference of opinion. Under this element, there is a "substantial ground for a difference of opinion" about an issue when the matter involves a "difficult central question of law which is not settled by controlling authority." *Lajim, LLC v. Gen. Elec. Co.*, No. 13-cv-50348, 2016 WL 626801, at *2 (N.D. Ill. Feb. 17, 2016) (quoting *Republic Bank of Chi. v. Desmond*, No. 13-cv-6835, 2015 WL 4397781, at *11 (N.D. Ill. Jul. 17, 2015)).

14

i.    *The preemption question of law is contestable because it is one of first impression in this Circuit and nationally.*

The absence of controlling law on a particular issue can constitute substantial grounds for a difference of opinion and thereby meet the element of contestability. In *Boim*, 291 F.3d at 1001, the parents of a young United States citizen murdered in Israel by Hamas terrorists sued for the loss of their son under 18 U.S.C. § 2333, which allows U.S. nationals who have been injured "by reason of an act of international terrorism" to file suit against responsible parties and recover treble damages. The defendants, individuals and organizations involved with Hamas, moved to dismiss the claims and, after the district court denied the motion, petitioned for an interlocutory appeal. *Id.* The Seventh Circuit held that the district court correctly certified for appeal three questions regarding the interpretation of the controlling federal statute, which it held was an issue of first impression in this Circuit. *Id.* at 1001, 1007-1008. The Seventh Circuit explained that the interpretation of the relevant statutory provisions not only "present[ed] questions of law which will control the outcome of this case[,]" but also held that "[a]s these are questions of first impression, the application of these statutes to the facts alleged here is certainly contestable, and the resolution of these issues will facilitate the conclusion of the litigation." *Id.* at 1007-1008; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626-27 (7th Cir. 2010) (finding that district court properly certified for interlocutory appeal a question as to the interpretation of *Twombly*/*Iqbal* pleading standards that had not been conclusively addressed by the Seventh Circuit).

Applying this precedent, this Court has held that while "the mere lack of judicial precedent" alone does not establish contestability under Section 1292, under the Seventh Circuit's holding in *Boim* "novel and difficult questions of first impression, similar to the interpretation of a statute, are contestable[.]" *Pugh v. Nat'l Collegiate Athletic Ass'n*, No. 115CV01747TWPDKL, 2016 WL 7100606, at *6 (S.D. Ind. Dec. 6, 2016). Other decisions of this Court and other courts in this

Circuit have reached similar conclusions. *See Hodgkins v. Goldsmith*, No. IP99-1528-C-T/G, 2000 WL 892964, at *26 (S.D. Ind. July 3, 2000), amended sub nom. *Hodgkins v. Peterson*, No. IP 99-1528-CTG, 2000 WL 1201599 (S.D. Ind. July 20, 2000) (holding that when "[t]here is no Seventh Circuit or Supreme Court case that clearly controls the outcome of the First Amendment issue in this case" and the Defendants presented "very substantial arguments" in favor of their interpretation that the Court ultimately rejected, there was a substantial ground for a difference of opinion under section 1292); *Merk v. Jewel Food Stores Div.*, No. 85-C-7876, 1986 WL 8969, at *2 (N.D. Ill. Aug. 14, 1986) (holding that there is substantial ground for difference of opinion as to two questions certified for interlocutory appeal when "there was no good precedent for either issue . . . and the correct answer is not obvious.").

Here, the preemption question in this case, turning on the interpretation of 21 C.F.R. § 330.1 and other OTC Monograph regulations, is contestable because it is one first impression in this Court and before the Seventh Circuit Court of Appeals: it has not been addressed in prior decisions of this Court, in other published opinions of courts in this Circuit, or by any federal Circuit Court or the Supreme Court.

Further, the specific question of the proper interpretation of the key OTC Monograph regulations, especially 21 C.F.R. § 330.1, appears to be a question of first impression nationally. In their preemption briefing, the parties cited one reported case that involved failure to warn claims brought against the manufacturer of a product regulated by a tentative final monograph: *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 144 F. Supp. 3d 699 (E.D. Pa. 2015). In that case, the district court denied the manufacturer's argument that summary judgment should be entered on the basis of preemption. However, as noted in Perrigo's preemption briefing, *see* Dkt. 86, p. 34, the specific product at issue in the *In re Tylenol* decision, Extra Strength

Tylenol, had been marketed at some periods of time under an NDA, and at other periods as a monograph product. *See id.* at 708-12. And, the *In re Tylenol* court held that preemption did not apply because, based on the *factual* record, the manufacturer had continued to treat Extra Strength Tylenol as if it was an NDA product even after formally withdrawing its NDA application in 1998; it made adverse event reports under the NDA file number and, crucially, had continued to make unilateral changes to its label via the Changes Being Effected ("CBE") process even after 1998. *Id.* at 729-30. Thus, as the district court pointedly noted, "[d]espite the defendants' insistence that changing the Extra Strength Tylenol label would be impossible, they already have done it." *Id.* at 730. None of the facts relied on by the *In re: Tylenol* court are present here; Equate Acetaminophen was marketed only as an OTC monograph drug, and Perrigo never used or tried to use the CBE mechanism to add warnings to its label (because that mechanism is not available for OTC monograph drugs like Equate Acetaminophen).

Because of the different regulatory history and the manufacturer's voluntary actions in the *In re Tylenol* case, that court did not rule on the question of whether a manufacturer can add new warnings to the label of product regulated under the IAAA TFM that was not previously regulated as an NDA product (i.e., like the Equate Acetaminophen product manufactured by Perrigo and sold by Wal-Mart). And, in ruling on preemption, the *In re Tylenol* court never once cited or addressed 21 C.F.R. § 330.1, the focus of Perrigo and Wal-Mart's preemption arguments.

        ii.        *The <u>in re Tylenol</u> decision addressing preemption in the context of a TFM product, while not squarely on point, cited to and relied on evidence that contradicts this Court's regulatory interpretation.*

Although the *In re Tylenol* decision is not squarely on point with the specific preemption question at issue here, some of the evidence on which that district court relied directly undercuts this Court's conclusion that the IAAA TFM and other tentative final monographs have no legal

force and effect and contain only voluntary suggestions. Specifically, the *In re Tylenol* court also cited to and relied upon an FDA letter[4] stating in pertinent part that "[u]nder a TFM, manufacturers market products at their own risk and are able to make voluntary adjustments taking into context the information presented in the proposed TFM." 144 F.Supp.3d at 731. This statement was made in the context of the defendant manufacturer's decision to reduce the ***dosage*** for its Extra Strength Tylenol product. As noted, the IAAA TFM provides exact, quoted language for drug warnings for an OTC Monograph acetaminophen product. But it treats labeling regarding dosages very differently, providing for a "flexible" dosage schedule, 53 Fed. Reg. at 46228, with recommended OTC dosage "ranges" for acetaminophen and a maximum daily limit. *Id.* at 46228, 46257. As stated in the full FDA letter, the reduction in the dosage of its Extra Strength Tylenol was therefore "a measure that can commonly be taken under the over-the-counter [IAAA] TFM and is in accordance with the provisions of the IAAA TFM." *See* Dkt. 102-2 (copy of the relevant FDA letter). Thus, unlike the change to warning statements at issue in this case, the *in re Tylenol* manufacturer could permissibly make a dosage change to its Extra Strength Tylenol product while fully complying with the relevant provisions of the IAAA TFM.

Of significance to the present motion, the statement in the letter that a manufacturer can make adjustments to a product regulated by a TFM only after "taking into context the information presented in the proposed TFM" and the agency's approving of the dosage change to Extra Strength Tylenol because it was made "in accordance with the provisions of the IAAA TFM" shows that the FDA regards compliance with the provisions of the IAAA TFM as mandatory. Thus, this letter directly contradicts the conclusion reached by this Court in its Summary Judgment Order that a TFM has no legal force and effect. The divergence between this Court's holding and

---

[4] This letter was later included as an exhibit to Plaintiff's briefing in this case, *see* Dkt. 102-2, and was also discussed extensively in Perrigo's Preemption Reply brief. *See* Dkt. 152, pp. 16-18

the FDA's statements quoted and relied upon in another published federal district court decision further demonstrates that there are substantial differences of opinion as to the Court's Order, suitable for resolution by an appellate court on interlocutory appeal.

> iii.     *The preemption question is also contestable because there are substantial grounds for differences of opinions as to the Court's regulatory interpretation that a TFM has no legal effect.*

In addition to the lack of case law authority on the preemption question, the preemption question is also contestable in that in there are substantial grounds for differences of opinion as to the Court's interpretation of the controlling regulations. Specifically, Perrigo and Wal-Mart respectfully submit that the Court's interpretation of "applicable monograph" in 21 C.F.R. § 330.1 as meaning only a "final monograph," and the Court's consequent holding that a tentative final monograph such as the IAAA TFM has no legal force and effect *see* Dkt. 199 at p. 10-12, were wrongly decided under principles of regulatory interpretation applied in this Circuit.

In this Circuit, where a regulatory term is undefined, courts ask "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Pyles v. Nwaobasi*, 829 F.3d 860, 865 (7th Cir. 2016) (quoting *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO*, 676 F.3d 566, 570 (7th Cir. 2012)). In doing so, courts "giv[e] the words used their ordinary meaning[,]" looking to "dictionary definitions, the construction of similar terms in other statutes or regulations, and the purpose of the [regulation] being interpreted." *Id.* (citations omitted). Courts may also "look past the express language of a regulation when it is ambiguous or where a literal interpretation would lead to an 'absurd result or thwart the purpose of the overall statutory scheme.'" *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 477 (7th Cir. 1999) (quoting *United States v. Hayward*, 6 F.3d 1241, 1245 (7th Cir. 1993).

Applying this law to the pertinent regulations, the Court's ruling is contradicted by the dictionary definitions of the term "applicable," construction of the term "applicable monograph" in other Monograph regulations, the purpose of the "exact match" requirement in 21 C.F.R. § 330.1, and the purpose of the overall OTC Monograph regulatory scheme.

First, in terms of definitions, the terms "applicable monograph" or "applicable OTC drug monograph" used in 21 C.F.R. § 330.1 are not defined in that regulation or in other relevant OTC monograph regulations found in 21 C.F.R. Part 330. Black's Law Dictionary (11th ed. 2019) defines the term "applicable" as: "1. Capable of being applied; fit and right to be applied. 2. (Of a rule, regulation, law, etc.) affecting or relating to a particular person, group, or situation; having direct relevance." Here, the IAAA TFM is clearly an "applicable" monograph under this definition. The labeling, formulation, dosage, and other requirements set forth in the IAAA TFM were published in the Federal Register and, as the record of this case reflects, have been adhered to by manufacturers of OTC acetaminophen products for decades. Thus, the IAAA TFM plainly had an "affect" on and "direct relevance" to OTC Monograph manufacturers of acetaminophen.

Second, contrary to the Court's holding, the construction of similar terms in other Monograph regulations also supports Perrigo and Wal-Mart's interpretation that a TFM is an applicable OTC drug monograph. As noted in Perrigo's preemption briefing, 21 C.F.R. § 330.10 sets forth the step-by-step process of developing a final OTC drug monograph: appointment of an advisory panel to review data on an OTC drug ingredient's safety and effectiveness and propose labeling, the panel making recommendations to the FDA Commissioner, and the FDA Commissioner then issuing first a proposed monograph, then a tentative final monograph, and ultimately a final monograph. 21 C.F.R. § 330.10(a)(1)-(9). The Court's narrow interpretation of "applicable monograph" as used in 21 C.F.R. § 330.10 as meaning only a "final monograph" begs

the question of why, if the FDA had intended for only products marketed under a final monograph to be subject to regulatory action but not those marketed under a tentative final monograph or proposed monograph, the agency did not simply say so explicitly instead of using the broad and inclusive term "applicable monograph" instead of the term "final monograph" already defined earlier in that same regulation.

Third, the Court's order omitted to consider the function and purpose of 21 C.F.R. § 330.1, which strongly supports Perrigo and Wal-Mart's interpretation that a TFM is an applicable OTC drug monograph. As noted, 21 C.F.R. § 330.1(c)(2) sets forth the "exact match" requirement for drug warnings and other labeling (apart from Indications for use) to follow exactly the quoted language appearing in an "applicable OTC drug monograph." If the Court is correct, and an "applicable OTC drug monograph" refers only to a final monograph, that requirement would only require manufacturers to follow the exact quoted language appearing in a final monograph. But a final monograph is a final rule that, at the time of publication in the Federal Register, has its labeling and other requirements codified into regulations in the Code of Federal Regulations. *See*, *e.g.*, 57 Fed. Reg. 27654-01 (June 19, 1992) (FDA "final rule in the form of a final monograph" establishing labeling and other conditions for safe and effective marketing of OTC Monograph male genital desensitizing external analgesic drug products); 21 C.F.R. § 348.50 (establishing exact labeling language, appearing in quotation marks, that must be used for OTC Monograph male genital desensitizing external analgesic drug products); 56 Fed Reg. 41008-01 (FDA "final rule in the form of a final monograph" establishing labeling and other conditions for safe and effective marketing of OTC Monograph topical acne drug products); 21 C.F.R. § 333.350 (establishing exact, quoted labeling language for OTC Monograph topical acne drug products).

Thus, the Court's interpretation would effectively render the "exact match" requirement in 21 C.F.R. § 330.1(c)(2) surplus to other OTC Monograph regulations; there would be no need for the FDA to adopt a regulation mandating that manufacturers adhere exactly to the labeling set forth in quotation marks "in an applicable OTC drug monograph" because each final monograph, codified as a binding regulation, would already so require. Such an interpretation would run counter to the canon against surplusage in interpreting statutes and regulations. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015) (describing canon against surplusage). A more reasonable interpretation of the "exact match" requirement in 21 C.F.R. § 330.1(c)(2) is that it was adopted, at least in part, to mandate compliance with OTC monographs *before* they are finalized in order to ensure the drugs marketed to consumers are safe and effective.

The Court's interpretation that a TFM has no legal effect is also incorrect when viewed in the context of the overall Drug Monograph Review process. Under that process, an advisory review panel of independent experts is established to review all available data on a class of OTC drugs' and propose standards to ensure those drugs are used safely and effectively. 21 C.F.R. § 330.10(a)(1)-(4). A core component of that expert review is a review of drug labeling: the independent expert panel is given a mandate to "review OTC drug labeling" and establish "conditions under which OTC drugs are generally recognized as safe and effective and not misbranded," 21 C.F.R. § 330.10(a)(1), applying the following standard:

> Labeling shall be clear and truthful in all respects and may not be false or misleading in any particular. It shall state the intended uses and results of the product; adequate directions for proper use; and warning against unsafe use, side effects, and adverse reactions in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use.

21 C.F.R. § 330.10(a)(4)(v). The panel then makes a report to the FDA Commissioner, who uses its recommendations to publish first a proposed monograph, then a tentative final monograph, and

22

ultimately a final monograph establishing labeling, formulation, dosage, and other safety standards necessary for an OTC drug to be sold safely and effectively and not be misbranded. 21 C.F.R. § 330.10(a)(4)-(9). Thus, by the time the process reaches the tentative final monograph stage, the conditions set in a TFM (including drug labeling) are based on years of substantial data as to the drug's safety and effectiveness and the recommendation of an independent expert review panel.

But, under the Court's interpretation of 21 C.F.R. § 330.1, the FDA would be unable to take regulatory actions to ensure that manufacturers comply with labeling, dosage, formulation, and other conditions that the agency believes, based on expert input and data, to be necessary for consumers to use those products safely and effectively until the TFM was ultimately finalized (a process which, for acetaminophen, has taken decades). With respect to labeling and drug warnings, such an interpretation would contradict the FDA's position that consistent warning statements on OTC products are necessary for consumer safety. In the Final Rule adopting 21 C.F.R. § 330.1(c)(2), the FDA explained that "[u]nlike indications for use . . . [t]he agency believes that concisely and consistently worded warnings are essential to the safe use of an OTC drug product and that permitting flexibility in this section of labeling could put consumers at risk . . . . Accordingly, the exact wording of warnings in an OTC drug monograph will continue to be required." Labeling of Drug Products for Over-the-Counter Human Use, 51 Fed. Reg. 16258-01, 16263 (May 1, 1986) (emphasis added). And, permitting drug manufacturers to add whatever warnings or labeling they believed appropriate would undoubtedly lead to a proliferation of overwarning on OTC product labels, which the FDA has repeatedly emphasized is a major concern for OTC drugs. *See General Labeling Conditions*, 40 Fed. Reg. 11717 (Mar. 13, 1975) (explaining the FDA position that, for OTC products, "if labeling contains too many required statements, . . . the impact of all warning statements on the label will be reduced."); s*ee also Cerveny v. Aventis,*

*Inc.*, 855 F.3d 1091, 1102 (10th Cir. 2017) ("FDA views overwarnings as problematic because they can render the warnings useless and discourage use of beneficial medications.").

Thus, the Court's interpretation and Summary Judgment Order on preemption is belied by the common understanding of the term "applicable" as well as the plain regulatory language of the relevant Monograph regulations (i.e., FDA's choice to use "applicable monograph" instead of "final monograph"). The Court's interpretative approach would also render the "exact match" requirement in 21 C.F.R. § 330.1(c)(2) entirely superfluous to other regulations and would run counter the FDA's emphasis on carefully crafted and consistent warnings and avoidance of overwarnings in OTC Monograph drug labeling to ensure consumer safety.

Moreover, as noted above, courts in this Circuit reject literal interpretations of statutes that "would lead to an absurd result or thwart the purpose of the overall statutory scheme.'" *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d at 477 (citations omitted). Here, it would be absurd and unreasonable to conclude that the FDA has put in place a regulatory system that would, on the one hand, require the FDA to formally publish proposed and tentative final monographs informing industry of all of the labeling, formulation, dosage and other product requirements that the agency views as safe and effective for consumers and permit manufacturers to market and sell common OTC products under those TFMs to tens of millions of consumers each week, while, on the other hand, prevent the FDA from in any way enforcing those specific labeling, formulation, dosage and other product requirements for the entirety of the years or decades the FDA will need to finalize the monograph.

For all of these reasons, there are substantial grounds for differences of opinion with the Court's interpretation of the controlling Monograph regulations and application of that interpretation in its preemption ruling, such that the ruling is well-suited for interlocutory review.

            *iv.*        *The preemption question is contestable because the Court's ruling is belied by the FDA's own enforcement history and prior statements.*

Finally, the Court's ruling is contestable because the FDA's own enforcement history and prior statements rebut the notion that tentative final monographs have no legal force and effect and that manufacturers cannot be held in violation of federal law for failing to follow a tentative final monograph. *Cf.* Dkt. 199, p. 11. As noted in Perrigo's preemption briefing, the FDA has, in fact, taken regulatory action when the labeling for products regulated by tentative final monographs deviated from the labeling set forth in the applicable TFM. *See* Dkt. 86, pp. 24-25. Perrigo included as an exhibit to its preemption briefing (*see* Dkt. 86-20) an FDA Warning Letter to Quadex Pharmaceuticals, the manufacturer of Viroxyn Professional, an OTC product intended for the treatment of cold sores and blisters, products that at the time were covered by a TFM. In that Warning Letter the FDA plainly stated that "[p]ending the issuance of final monographs for OTC cold sore/fever blister drug products, the agency does not object to the marketing of products that meet both the formulation and labeling requirements described on the [applicable] tentative final monographs."[5] Dkt 86-20 at p. 2 (emphasis added). And, the FDA found the marketing of the Viroxyn Professional OTC product objectionable in part because it "[did] not conform to the formulation and labeling provisions in the above-cited tentative final monographs." *Id.* Thus, the Warning Letter demonstrates that the FDA has interpreted the monograph regulatory framework to mandate that products marketed under a TFM meet the labeling requirements set forth in the TFM. In other words, the FDA's position is that a TFM ***does*** have legal force and effect; otherwise,

---

[5] *See* Skin Protectant Drug Products for Over-the-Counter Human Use; Fever Blister and Cold Sore Treatment Drug Products, 55 Fed. Reg. 3362-01 (Jan. 31, 1990).

deviating from the warning and other labeling requirements stated in a TFM would not be a basis for objections and regulatory actions by the agency.[6]

The FDA's conduct and statements with respect to the Allergy Alert for OTC Monograph acetaminophen products likewise reflect that the agency regarded the IAAA TFM as having binding legal force and effect. If the FDA's understanding of the regulatory regime for OTC Monograph products was the same as that held by Plaintiffs and the Court, then the FDA might expect that issuing the all-points August 2013 Drug Safety Communication would suffice to permit manufacturers of OTC Monograph acetaminophen-containing products to add new voluntary warning language of their choosing regarding the newly announced risk of serious skin reactions with use of acetaminophen. But the FDA plainly did not regard the Drug Safety Communication in such a light, as it took the subsequent step of issuing the November 28, 2014 Draft Guidance and publishing in it in the Federal Register, explicitly stating that the FDA "does not intend to object to the marketing of products" with the precise warning language and placement set forth in the Draft Guidance. The FDA's course of action compels the conclusion that the FDA thought that marketing of OTC Monograph acetaminophen-containing products with warning language as to serious skin reactions prior to the issuance of agency guidance *would* have been objectionable -- otherwise, there would have been no need to issue guidance documents that included formal

---

[6] In its Summary Judgment Order, the Court stated that "the FDA's position in that letter was not that the product at issue was misbranded simply because its label was different from that proposed in the applicable tentative final monograph; rather, the FDA found that the label contained statements that were misleading." Dkt. 199, p. 14 n.5. Perrigo and Wal-Mart respectfully disagree; the Warning Letter is clear that the agency deemed the Viroxyn Professional product misbranded because its manufacturer did not follow the formulation and labeling provisions of the applicable TFMs. The violations with respect to misleading labeling language for herpes were explicitly stated to be "[i]n addition" to the failure to comply fully with the formulation and labeling requirements of the TFM. Dkt. 86-20 at p. 2 Moreover, the FDA explained that the reason that adding warning language regarding herpes was misleading was *because the applicable TFM had stated* that it was inaccurate to describe "herpes" as the cause of cold sores and blisters, as "consumers may associate the term with the genital form of herpes." *Id.* (citing 55 Fed. Reg. at 3373). Thus, all of the violations addressed in the warning letter were due to noncompliance with the applicable TFM covering OTC cold sore products.

statements that the FDA would not object to adding a specific, FDA-drafted warning statement. Thus, the FDA's actions show it regarded compliance with the labeling provisions of the IAAA TFM as mandatory until and unless the agency issued an enforcement discretion statement through guidance permitting manufacturers to add new warning language.

In summary, the Court's ruling on the preemption question involves an issue as to which there is substantial ground for difference of opinion. The question of whether state law failure to warn claims are preempted for a product regulated by a tentative final monograph pursuant to 21 C.F.R. § 330.1 is one of first impression before this Circuit and nationally. Therefore, there is an absence of controlling law and the issue is contestable per the Seventh Circuit's holdings in *Boim*, 291 F.3d at 1007-08, *In re Text Messaging Antitrust Litig.*, 630 F.3d at 626-27, and this Court's ruling in *Pugh*, 2016 WL 7100606, at *6. Further, the issue is contestable because Perrigo has advanced substantial arguments based on the language and overall framework of regulations for OTC Monograph products as well as the FDA's enforcement history and guidance documents showing that a TFM is an "applicable monograph" under 21 C.F.R. § 330.1 and, therefore, that defendants were required to adhere to the exact warning language set forth in the IAAA TFM.

### 5. *Resolution of the preemption question of law will expedite the ultimate resolution of this case.*

The Seventh Circuit has held that "all that section 1292(b) requires as a precondition to an interlocutory appeal, once it is determined that the appeal presents a controlling question of law on which there is a substantial ground for a difference of opinion, is that an immediate appeal *may* materially advance the ultimate termination of the litigation." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (emphasis in original).

Here, this standard is plainly met, as resolution of the preemption issue will materially advance the ultimate resolution of this litigation regardless of the outcome on appeal. In its

27

Summary Judgment Order, this Court granted summary judgment on non-preemption grounds for Wal-Mart as to all claims based on the L.N.K.-manufactured Equate "Severe Allergy & Sinus Headache" product, and for both Wal-Mart and Perrigo as to all of Plaintiff's claims against them with respect to the Equate Acetaminophen product except failure to warn under the Indiana Product Liability Act and a related loss of consortium claim. Dkt. 199, pp. 32, 42. Therefore, if this Court's preemption holding is reversed, Perrigo and Wal-Mart will be entitled to summary judgment on Plaintiffs' only remaining claims against them. This could--at the very least--significantly streamline the trial and pre-trial presentations moving forward. In contrast, if this Court's preemption holding is affirmed, the parties will have clarity on a critical legal issue, and the potential cloud that would otherwise hang over pre-trial settlement discussions and any potential jury verdict will be removed. *See Boim*, 291 F.3d at 1001, 1007-1008 (holding that the resolution of statutory interpretation questions of first impression "will facilitate the conclusion of the litigation."); *Sterk*, 672 F.3d at 536 (noting that uncertainty about whether a claim is legally permissible "may delay settlement . . .and by doing so further protract the litigation," and that such uncertainty "is enough to satisfy the 'may materially advance' clause of section 1292(b)."). Either way, appellate review and resolution will advance the ultimate resolution of the case.

### 6.     *This motion was filed within a reasonable time*

Perrigo and Wal-Mart file this motion 30 days after the entry of the Court's Summary Judgment Order. This time period falls well within the boundaries of "reasonableness" as interpreted and applied by courts in this Circuit. *See*, *e.g.*, *Boim*, 291 F.3d 1000, 1008 (7th Cir. 2002) (finding that motions for certificates of appealability filed on February 14, 2001 were filed within a reasonable amount of time after the court's January 10, 2001 decision). *Kisting v. Gregg*

*Appliances, Inc.*, No. 16-CV-141, 2017 WL 44832, at *1 (E.D. Wis. Jan. 4, 2017) (motion filed "less than one month" after order held to be reasonable).

## IV.   CONCLUSION

WHEREFORE, for the foregoing reasons, Perrigo and Wal-Mart respectfully request that the Court certify the Summary Judgment Order for an immediate interlocutory appeal to allow the Seventh Circuit to decide the controlling legal question of whether Plaintiffs' failure-to-warn claims against Perrigo and Wal-Mart are preempted.

|  |  |
|---|---|
| _/s/ Richard M. Barnes_ | _/s/ Richard M. Barnes_ |
| Mary Nold Larimore (#9877-49) | Richard M. Barnes (*pro hac vice*) |
| (larimore@icemiller.com) | (rmb@gdldlaw.com) |
| (signed by Richard M. Barnes with permission | Bonnie J. Beavan (*pro hac vice*) |
| of Mary Nold Larimore) | (bjb@gdldlaw.com) |
| ICE MILLER LLP | Sean Gugerty (*pro hac vice*) |
| One American Square, Suite 2900 | (sgugerty@gdldlaw.com) |
| Indianapolis, IN 46282-0200 | GOODELL, DEVRIES, LEECH & DANN, LLP |
| Tel: 317-236-2100  Fax: 317-236-2219 | One South Street, 20th Floor |
| **Local Counsel for Defendant, L. Perrigo** | Baltimore, Maryland 21202 |
| **Company** | Tel:  (410) 783-4000   Fax:  (410) 783-4040 |
|  | **Counsel for Defendant, L. Perrigo Company** |

_/s/ Richard M. Barnes_
Kevin C. Schiferl (#14138-49)
(kschiferl@fbtlaw.com)
Haley A. Johnston (#34068-53)
(hjohnston@fbtlaw.com)
(signed by Richard M. Barnes with permission
of Kevin C. Schiferl)
FROST BROWN TODD, LLC
201 N. Illinois Street, Suite 1900
Indianapolis, IN 46204
Tel: 317-237-3800   Fax: 317-237-3900
**Counsel for Defendant,**
**Wal-Mart Stores, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of July, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all *registered* parties.

_____*/s/ Richard M. Barnes*_____
Richard M. Barnes

30